UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| *vs.* | ) | 1:13-cr-00108-JMS-DKL-1 |
| | ) | |
| JACK ROBBINS, | ) | |
| *Defendant.* | ) | |

## ORDER

Presently pending before the Court is Defendant Jack Robbins' Motion to Suppress. [Dkt. 110.] For the reasons explained, the Court **DENIES** the motion. Three of Mr. Robbins' codefendants also have suppression motions pending before the Court. The Court decides those motions in separate orders also issued on this date.

## I.
### BACKGROUND

Law enforcement applied for a search warrant for Mr. Robbins' residence based solely on the affidavit of Federal Bureau of Investigation Special Agent Todd Prewitt (the "Prewitt Affidavit"). A magistrate judge concluded that the affidavit was sufficient to establish probable cause and issued a search warrant. [Case No. 1:13-mj-00196-DML, Dkt. 2 at 1.] Mr. Robbins moves to suppress evidence discovered in his residence as a result of this search warrant solely on the ground that the Prewitt Affidavit was insufficient to establish probable cause that evidence of a crime would be found at his residence. [*See, e.g.*, Dkt. 111 at 7.] Accordingly, the parties do not dispute the facts necessary to resolve Mr. Robbins' motion, and the Court's factual background focuses on the attestations in the Prewitt Affidavit.

The Prewitt Affidavit begins by setting forth in detail "common practices of indoor marijuana growers and distributors" based on Special Agent Prewitt's "training and experience, . . .

- 1 -

participation in the investigation of indoor marijuana grow operations, and . . . consultation with experienced federal and state law enforcement officers." [Prewitt Affidavit at 4; *see id.* at 4-12.] Particularly relevant here is Special Agent Prewitt's statement that "it is generally a common practice for drug traffickers to store drug inventory, drug related paraphernalia, and records related to drug trafficking in their residences and vehicles." [*Id.* at 7 ¶ 11.] For example, Special Agent Prewitt states that it is a "common practice for traffickers to conceal at their residences large sums of money" and "[e]vidence of . . . financial transactions and records relating to income and expenditures . . . in connection with drug trafficking." [*Id.* at 7-8 ¶¶ 13-14.] He further attests to knowledge of the fact that courts "have recognized that, with respect to drug dealers, evidence of their involvement in the drug trade is likely to be found where the dealers reside—even if no drug trafficking was observed to occur there." [*Id.* at 12 ¶ 24.]

After detailing common practices of indoor marijuana growers and distributors, the Prewitt Affidavit sets forth eleven individuals under investigation for participation in a conspiracy to grow and distribute marijuana. [*Id.* at 12-13 ¶ 25.] Mr. Robbins was one such individual, and Special Agent Prewitt "believed [Mr. Robbins] to be a leader of the organization"—which the Prewitt Affidavit refers to as the "Robbins Organization"—"and is responsible for coordinating the overall activities of this organization and receiving the financial proceeds of the marijuana sales." [*Id.* at 12 ¶ 25a.]

Special Agent Prewitt then described in detail law enforcement's investigative efforts into the Robbins Organization. The Court focuses here on the attestations related to Mr. Robbins. To establish probable cause to search Mr. Robbins' residence, Special Agent Prewitt relies on information provided by two confidential sources, referred to in the Prewitt Affidavit as "CS#1" and "CS#2." [*Id.* at 14-15 ¶ 28-29.] Special Agent Prewitt believed the confidential sources to

be reliable given that they "have provided reliable information in the past and have been corroborated unknowingly by one another and by independent investigation conducted by [Special Agent Prewitt] and other agents in [the] case." [*Id.* at 15 ¶ 29.]

CS#1 voluntarily approached law enforcement with information regarding the Robbins Organization, stating that "he/she wanted to provide law enforcement the information because of personal ties with a member of the Robbins Organization" and because CS#1 was "concern[ed] for th[e] individual's well-being due to substantial involvement with controlled substances and the criminal activities of the Robbins Organization." [*Id.* at 15-16 ¶ 31.] Law enforcement then determined that CS#1 "has legitimate employment, is not a target of any criminal investigation, has no known involvement in criminal activity, and is not subject to any known pending criminal charges." [*Id.* at 16 ¶ 31.] Moreover, law enforcement corroborated "most of the information provided by CS#1" and "is aware of no instance in which CS#1's information has been knowingly false or of any other circumstances casting doubt on CS#1's credibility." [*Id.*]

CS#1 provided specific information to law enforcement regarding the operations of the Robbins Organization, including that the organization "has been in operation for over 15 years," makes "about $40,000 to $50,000 per month in proceeds from the sale of . . . marijuana," and that Mr. Robbins' co-defendant Robbyn Kaczmarek "was involved (at the time) in the day to day operation of at least four marijuana grow houses for the Robbins Organization." [*Id.* at 16 ¶ 32.] Particularly relevant to the instant motion is that CS#1 informed law enforcement that "one of the leaders of the Robbins Organization and [Ms.] Kaczmarek's 'boss' [i]s an individual . . . in his mid-30s, who has twin sons approximately three years old and who drives a Nissan Maxima." [*Id.* at 17 ¶ 33.] That individual "has since been identified by law enforcement as [Mr.]

Robbins." [*Id.*]  This identification was made at least in part because law enforcement independently corroborated each of the facts regarding Ms. Kaczmarek's "boss."  Specifically,

> [l]aw enforcement verified [Mr.] Robbins was born in 1976, making him thirty-six years old.  A review of publically accessible Facebook pages shows a photograph on Kerri Strange's profile of [Mr.] Robbins holding twin sons that appear to be about three years old.  Law enforcement has also received information that Kerri Strange . . . has twin sons with Robbins.  Law enforcement has observed [Mr.] Robbins driving a gray Nissan Maxima . . . .  A check though the Indiana Bureau of Motor Vehicles revealed the vehicle is a gray 2008 Nissan registered to [Mr.] Robbins.

[*Id.* at 21 ¶ 43.]

CS#1 further provided law enforcement with "information which assisted [them] in the identification of the addresses/locations of ultimately five marijuana grow houses utilized by the Robbins Organization."  [*Id.* at 17 ¶ 34.]  "Physical and electronic surveillance of the Robbins Organization have corroborated CS#1's information regarding members of the [organization] and the location of grow houses."  [*Id.* at 19 ¶ 38.]  Specifically, "[s]urveillance has shown [Mr.] Robbins, [Ms.] Kaczmarek and other members of the Robbins Organization and their known vehicles frequently visiting the location believe to be indoor marijuana grow houses."  [*Id.* at 19-20 ¶ 38.]

The Prewitt Affidavit next details information provided to law enforcement by CS#2.  CS#2 admitted to law enforcement that "he/she purchased large amounts of marijuana from various supplies in Southern Indiana and had familiarity with a number of regional suppliers of indoor-grown marijuana."  [*Id.* at 20 ¶ 40.]  Following CS#2's arrest, information CS#2 provided "led to the discovery of a large indoor grow in Jackson County."  [*Id.*]  CS#2 provided further information regarding the Robbins Organization, including by participating in controlled marijuana purchases at the direction of law enforcement.  [*Id.*]  For example, CS#2 admitted to the purchase of marijuana from Mr. Robbins' codefendant Drew Hall "over 100 times over the past fif-

teen years" and believed that Mr. Hall "was getting his marijuana from [Mr.] Robbins and possibly other sources of supply." [*Id.* at 21 ¶¶ 42-43.] Further, CS#2 informed law enforcement that [Mr.] Robbins and [his codefendant] Eric Bell were responsible for or associated with at least four to five indoor marijuana growing operation in the area." [*Id.* at 22 ¶ 44.] Although CS#2 never purchased marijuana directly from Mr. Robbins or Mr. Bell, CS#2 "provided a cellular telephone number . . . for [Mr.] Robbins, which law enforcement corroborated." [*Id.*]

> The Prewitt Affidavit also contains information regarding Mr. Robbins' financial status:
>
> [Mr.] Robbins showed no income with the Indiana Department of Revenue (IDOR) through the calendar years of 2008 thru 2011. [Mr.] Robbins also has no employment history on file with the State of Indiana. . . . [Mr.] Robbins currently resides in an 8,000 square foot home, and [Special Agent Prewitt] has received information that he rents for $6,000 a month. [Mr.] Hall told CS#2 that [Mr.] Robbins was paying $1,000 a week in child support to [Ms.] Strange . . . . [Mr.] Robbins shows ownership of a 2008 Nissan Maxima SE and 2009 Honda Motorcycle. [Mr.] Robbins also has possession of a 2011 Toyota Tundra that is registered in his mother's name. The Toyota was purchased for $55,672.00.

[*Id.* at 25 ¶ 47a.]

The Government readily admits that the Prewitt Affidavit does not contain any "indication that [Mr.] Robbins' [r]esidence was being used as a grow site." [Dkt. 119 at 3 (citing Prewitt Affidavit at 43 ¶ 66).] With respect to Mr. Robbins' residence, however, the Prewitt Affidavit states that the owner of the property informed law enforcement "that he was selling the house on a lease-to-own basis" for "$6,000 per month" to "an individual later identified by investigators as [Mr.] Robbins." [Prewitt Affidavit at 43 ¶ 65.] The residence "has approximately 8,000 square feet and had a reported assessed value of $681,000 in 2011." [*Id.*] Special Agent Prewitt believed the residence in question "to be the primary residence of [Mr.] Robbins, and . . . based on [Special Agent Prewitt's] training and experience, persons involved in the drug trade commonly keep at the residence computers, cellular phones, U.S. Currency, documents, ledgers .

. . , and items associated with the cultivation, harvesting and distribution of marijuana." [*Id.* at 44 ¶ 67.] The Prewitt Affidavit concluded, "Based on credible information received from CS#1 and CS#2, as well as independent investigation set forth in this affidavit, [Mr.] Robbins is one of the leaders of the Robbins Organization leading [Special Agent Prewitt] to believe that fruits and/or instrumentalities of the organization's drug trafficking activities will be concealed at [Mr. Robbins'] residence." [*Id.*]

As previously stated, the magistrate judge approved a search warrant for Mr. Robbins' residence. [Case No. 1:13-mj-00196-DML, Dkt. 2 at 1.] Mr. Robbins now challenges whether the Prewitt Affidavit established probable cause such that the search warrant was properly issued.

## II.
### DISCUSSION

The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and *no Warrants shall issue, but upon probable cause*." U.S. CONST. amend. IV (emphasis added). It is well-established, however, that a violation of this right does not automatically result in the suppression of the evidence discovered as a result of the violation. *See Herring v. United States*, 555 U.S. 135, 140 (2009) ("We have repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation."); *United States v. Leon*, 468 U.S. 897, 905-06 (1984) (rejecting the contention that "the exclusionary rule is a necessary corollary of the Fourth Amendment"). Although Mr. Robbins focuses on whether probable cause existed to search his residence, [dkt. 111 at 4-7], the Government contends that there was probable cause and that, even if there was not, suppression is unwarranted because law enforcement relied in good-faith on the magistrate judge's determination that probable cause ex-

isted, precluding suppression of the resulting evidence, [dkt. 119 at 4-12]. The Court will address probable cause and the good-faith exception in turn.

### A.  Probable Cause Existed to Search Mr. Robbins' Residence

"Probable cause is a practical, nontechnical inquiry that asks whether there is a fair probability, given the totality of the circumstances, that evidence of a crime will be found in a particular place." *United States v. Orozco*, 576 F.3d 745, 748 (7th Cir. 2009) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "When, as here, an affidavit is the only evidence presented to a judge to support a search warrant, 'the validity of the warrant rests solely on the strength of the affidavit.'" *United States v. Mykytiuk*, 402 F.3d 773, 775 (7th Cir. 2005) (quoting *United States v. Peck*, 317 F.3d 754, 755-56 (7th Cir. 2003)). The Court must therefore determine whether the Prewitt Affidavit "established probable cause to search [Mr. Robbins'] home for narcotics . . . related evidence." *Orozco*, 576 F.3d at 748. "A search warrant affidavit establishes probable cause when, based on the totality of the circumstances, it sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *Mykytiuk*, 402 F.3d at 776 (citation and quotation marks omitted). "On the mixed question whether the facts add up to probable cause," the Court must give "great deference to the conclusion of the judge who initially issued the warrant." *United States v. Curry*, 538 F.3d 718, 729 (7th Cir. 2008) (citation and quotation marks omitted). Indeed, the Court must "defer to [the issuing judge's] initial determination if there is 'substantial evidence in the record' that supports h[er] decision." *Id.* (quoting *United States v. Koerth*, 312 F.3d 862, 865 (7th Cir. 2002)).

When, as here, "the affidavit is supported by an informant's tip, [the Court must] examine the totality of the circumstances to determine probable cause." *United States v. Sims*, 551 F.3d 640, 644 (7th Cir. 2008). Specifically, the Court considers "several factors: (1) the degree

to which the informant has acquired knowledge of the events through firsthand observation, (2) the amount of detail provided, (3) the extent to which the police have corroborated the informant's statements, and (4) the interval between the date of the events and the police officer's application for the search warrant." *United States v. Sutton*, 742 F.3d 770, 773 (7th Cir. 2014). "It is also significant if an informant appears before the magistrate in person and files his or her own supportive affidavit; doing so affords the magistrate a greater opportunity to assess credibility." *Id.* (citing *Sims*, 551 F.3d at 640). In the end, however, "[r]eliability is the touchstone for determining whether an informant's statement is sufficient to establish probable cause." *United States v. Hollingsworth*, 495 F.3d 795, 805 (7th Cir. 2007).

Mr. Robbins argues that probable cause did not exist by assailing the reliability of both confidential informants discussed in the Prewitt Affidavit. [*See* dkt. 111 at 6-7.] As to CS#1, Mr. Robbins argues that his/her information was not gained "through firsthand observation—quite the contrary, that information came from [Ms.] Kaczmarek." [*Id.* at 6.] Moreover, Mr. Robbins contends that CS#1 "provided little detail" and that, even though law enforcement received CS#1's "information in August of 2011 . . . [Special Agent] Prewitt did not apply for the warrant . . . until February of 2013." [*Id.*] Regarding CS#2, Mr. Robbins points out that "there is no indication that CS#2 ever had any contact with [Mr.] Robbins" and criticizes the Prewitt Affidavit for setting out "CS#2's conclusions as if they were fact." [*Id.*]

The Government responds that CS#1's information need not come "from firsthand information," as the Seventh Circuit has held that "hearsay may support probable cause so long as the information is reliable." [Dkt. 119 at 6.] Moreover, contrary to Mr. Robbins' position, the Government contends that CS#1 provided numerous details regarding Mr. Robbins, and that this information was rightly considered reliable given that the Prewitt Affidavit makes clear that

much of CS#1's information was independently corroborated and none of it was determined to be false. [*Id.* at 6-7.] As to CS#2, the Government points out that he/she admitted to law enforcement—against penal interest—to purchasing marijuana from Mr. Hall that CS#2 believed was supplied by Mr. Robbins. [*Id.* at 8.] Although CS#2 did not detail the basis for this belief, says the Government, the magistrate judge "could reasonably conclude that CS#2's information was reliable in light of [Special Agent] Prewitt's statement that CS#2's prior information had led to the discovery of a large indoor marijuana grow," CS#2's controlled marijuana purchases from Mr. Hall, and "the fact that other information provided by CS#2 about [Mr.] Robbins was consistent with information officers had received." [*Id.*] The Government additionally argues that the confidential sources' connection of Mr. Robbins to drug trafficking is further corroborated by Mr. Robbins' "apparent lack of legitimate income," which is contrary to his expensive lifestyle. [*Id.* at 9.] Finally, the Government maintains that, "even in the absence of direct evidence linking criminal objects to [Mr.] Robbins' residence," Special Agent Prewitt's training and experience that evidence of drug trafficking will commonly be found in a drug trafficker's primary residence is sufficient to establish probable cause that such evidence will be found. [*Id.*]

The Court agrees with the Government that the Prewitt Affidavit establishes probable cause to search Mr. Robbins' residence. Considering the totality of the circumstances, as the Court must, *Sutton*, 742 F.3d at 773, the confidential sources provided reliable information to law enforcement regarding Mr. Robbins' involvement in drug trafficking. CS#1 provided detailed information regarding Ms. Kaczmarek's boss who CS#1 knew to be "one of the leaders of the Robbins Organization." [Prewitt Affidavit at 17 ¶ 33.] Specifically, CS#1 informed law enforcement that Ms. Kaczmarek's boss was "in his mid-30s, . . . has twin sons approximately three years old and . . . drives a Nissan Maxima." [*Id.*] Law enforcement then independently

- 9 -

corroborated that all three of these facts are true of Mr. Robbins. [*Id.* at 21 ¶ 43.] CS#1 further provided law enforcement with "information which assisted [law enforcement] in the identification of the addresses/locations of ultimately five marijuana grow houses utilized by the Robbins Organization," [*id.* at 17 ¶ 34], and again, law enforcement surveillance supported the notion that the identified locations were grow houses and observed Mr. Robbins and Ms. Kaczmarek or their respective vehicles visiting those locations, [*id.* at 19-20 ¶ 38].

CS#2 provided information to law enforcement that was consistent with and corroborated CS#1's information. Specifically, CS#2, who had previously led law enforcement to another indoor marijuana grow, informed law enforcement that Mr. Robbins and Mr. Bell were associated with at least four to five indoor marijuana growing operations in the area." [*Id.* at 22 ¶ 44.] CS#2's basis for knowledge regarding Mr. Robbins' activities is corroborated by that fact that CS#2 "provided a cellular telephone number . . . for [Mr.] Robbins, which law enforcement corroborated." [*Id.*]

Finally, the confidential sources' allegations regarding Mr. Robbins and the vast extent of his drug trafficking activities was independently corroborated by Mr. Robbins' lack of reported income and apparent wealth. Specifically, Mr. Robbins showed no income with the Indiana Department of Revenue from 2008 to 2011 and had no employment history on file with the State of Indiana, yet his residence was an 8,000 square foot home, and Special Agent Prewitt "received information that he rents [the residence] for $6,000 a month" and owns multiple vehicles. [*Id.* at 25 ¶ 47a.]

Mr. Robbins is correct that two of the factors the Court must consider in weighing the reliability of confidential source information are not present, as neither source had firsthand observation of Mr. Robbins' activities and they provided the information to law enforcement over a

year before law enforcement applied for a search warrant. *See Sutton*, 742 F.3d at 773. But these factors are not dispositive. CS#1 informed law enforcement that the Robbins Organization had been distributing marijuana for fifteen years, [Prewitt Affidavit at 16 ¶ 32], and law enforcement surveillance of several suspected indoor marijuana grow houses confirmed the existence of an extensive and ongoing criminal enterprise. In situations such as this, "when the affidavit refers to facts that indicate ongoing continuous criminal activity," the "[p]assage of time [factor] is less critical." *United States v. Pless*, 982 F.2d 1118, 1126 (7th Cir. 1992); *see United States v. Mitten*, 592 F.3d 767, 775 (7th Cir. 2010) (citing cases). Moreover, whether the confidential sources' information was based on personal observation or hearsay is irrelevant when the information is otherwise trustworthy. *See Hollingsworth*, 495 F.3d at 805 ("[W]e have repeatedly stated that a search warrant need not be based on first-hand observations . . . . If the individuals providing the informant's statement to the magistrate are reliable, then it makes little difference whether there are one or two levels of hearsay.").

In any event, the strength of the remaining two factors overwhelms any doubt cast by these deficiencies. Both confidential sources provided numerous details regarding Mr. Robbins' activities, several of which law enforcement corroborated and none of which law enforcement determined to be incorrect. In the end, "[r]eliability is the touchstone for determining whether an informant's statement is sufficient to establish probable cause," *Hollingsworth*, 495 F.3d at 805, and the independent corroboration of the confidential sources' information sufficiently establishes the reliability of their statements and the existence of probable cause.

One issue related to probable cause remains outstanding. At this point, the Court has concluded that the Prewitt Affidavit is sufficient to establish probable cause that Mr. Robbins was engaged in drug trafficking. But the Government acknowledges that the Prewitt Affidavit

contained "no indication that [Mr.] Robbins' [r]esidence was being used as a grow site," [dkt. 119 at 3], even though the search warrant Mr. Prewitt challenges authorized the search of his residence. However, as the Government rightly points out, the Seventh Circuit has repeatedly held that the "Government need not provide direct evidence that fruits of the crime or other evidence will be found in the location specified: The magistrate judge is entitled to draw reasonable inferences about where evidence is likely to be kept, and [s]he need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit." *Curry*, 538 F.3d at 729 (citation and quotation marks omitted); *see United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991) ("Warrants may be issued even in the absence of [d]irect evidence linking criminal objects to a particular site.") (alteration in original) (citation and quotation marks omitted). Indeed, the Seventh Circuit has explicitly recognized that "[i]n the case of drug dealers, evidence is likely to be found where the dealers live." *Orozco*, 576 F.3d at 745 (alteration in original) (citation and quotation marks omitted).

In *Orozco*, the "only support for a link between [the defendant's] home and the sought-after evidence of drug dealing and gang activity was [the] Agent['s] . . . belief—informed by his decade of experience as a narcotics investigator—that [the defendant], as second-in-command of the Aurora Latin Kings gang, would keep drug- and gang-related evidence at his home." *Id.* at 749. The Seventh Circuit upheld the determination that probable cause existed, stating that "[t]he issuing magistrate judge was entitled to credit [the Agent's] lengthy experience and high degree of confidence that the sought-after evidence was very likely to be found in [the defendant's] home." *Id.* at 750. As in *Orozco*, the magistrate judge in this case could rely on Agent Prewitt's attestation that the residence in question is "the primary residence of [Mr.] Robbins, and . . . based on [his] training and experience, persons involved in the drug trade commonly

keep at the[ir] residence computers, cellular phones, U.S. Current, documents, ledgers . . . , and items associated with the cultivation, harvesting and distribution of marijuana."[1] [*Id.* at 44 ¶ 67.]

Accordingly, giving "great deference to the decision of the [M]agistrate [J]udge," as the Court must, *Orozco*, 576 F.3d at 750 (citation and quotation marks omitted), the Court concludes that the Prewitt Affidavit was sufficient to establish probable cause to search Mr. Robbins' residence.

### B. The Good-Faith Exception to the Exclusionary Rule is Applicable

Although the Court could rest its denial of Mr. Robbins' Motion to Suppress on the existence of probable cause alone, the good-faith exception to the exclusionary rule provides an independent basis to reach the same result. The good-faith exception provides that evidence obtained as a result of a Fourth Amendment violation should not be suppressed if law enforcement had a "reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment." *United States v. Leon*, 468 U.S. 897, 909 (1984) (citations and quotation marks omitted). Exclusion of such evidence is unwarranted because the exclusionary "rule's sole purpose . . . is to deter future Fourth Amendment violations." *Davis v. United States*, 131 S. Ct. 2419, 2426

---

[1] The Court recognizes that the Seventh Circuit in *Orozco* distinguished a Sixth Circuit case on the ground that the affidavit in question was "stronger than the affidavit at issue" in the Sixth Circuit case; in *Orozco* the agent stated that evidence "will be found" in the defendant's residence, while in the Sixth Circuit case the agent stated that it was "not uncommon" for such evidence to be found in safe deposit boxes. 576 F.3d at 749-50 (quoting *United States v. Schultz*, 14 F.3d 1093 (6th Cir. 1994)). *Orozco*, however, did not hold that an agent must be near certain that evidence of a crime will be found for his testimony to be sufficient. In other words, although *Orozco* highlighted that the magistrate judge could rely on the agent's "lengthy experience and high degree of confidence that the sought-after evidence was very likely to be found in [the defendant's] home," it did not hold that agents who express a lesser degree of certainty could not establish probable cause. *Id.* at 750. Moreover, it is not even clear that Agent Prewitt's overall statements convey a lesser degree of certainty, as he described in detail, based on his experience, what type of evidence drug traffickers often conceal in their residences and why they were likely to do so. [Prewitt Affidavit at 7-8 ¶¶ 11-15.] These statements provide a sufficient basis for the Magistrate Judge to conclude that Agent Prewitt conveyed a sufficient level of certainty that evidence of drug trafficking would be found in Mr. Robbins' residence.

(2011); *see United States v. Brown*, --- F.3d ----, 2014 WL 821278, at *1 (7th Cir. 2014) ("The exclusionary rule is designed to deter violations of the fourth amendment."). Therefore, "[w]here the official action was pursued in complete good faith . . . the deterrence rationale loses much of its force." *Leon*, 468 U.S. at 919. Indeed, "[i]n light of the substantial societal costs of the rule, and recognizing that the primary, if not sole, justification for the exclusionary rule is the deterrence of police misconduct, the Supreme Court held in *Leon* that suppression of evidence is not an appropriate remedy when the officers who obtained the evidence did so in good faith reliance upon a facially valid warrant issued by a magistrate or judge." *United States v. Mitten*, 592 F.3d 767, 770 (7th Cir. 2010).

"In deciding whether an officer was acting in good faith, the fact that the officer sought to obtain a warrant is prima facie evidence that he was acting in good faith." *Id.* at 771 (citing *United States v. Bell*, 585 F.3d 1045, 1052 (7th Cir. 2009)). "The presumption of good faith that thereby arises, however, can be rebutted if the defendant shows that '(1) the judge issuing the warrant abandoned his detached and neutral role; (2) the officer was dishonest or reckless in preparing the affidavit; or (3) the warrant was so lacking in probable cause that the officer's belief in its existence was entirely unreasonable.'" *Id.* (quoting *United States v. Garcia*, 528 F.3d 481, 487 (7th Cir. 2008)).

Here, the fact that Agent Prewitt sought a search warrant for Mr. Robbins' residence is *prima facie* evidence that he was acting in good faith. *See id.* at 770; *Bell*, 585 F.3d at 1052. The Government maintains that none of the three methods by which this evidence can be rebutted is present. [Dkt. 119 at 11-12.] Mr. Robbins did not argue otherwise in his opening brief, and declined to file a reply brief specifically responding to the Government's position. This is perhaps because the record appears devoid of evidence that would allow Mr. Robbins' to rebut

the presumption. There is certainly no evidence of the former two methods, and as to the third, the Court's discussion in Section II.A above demonstrates that probable cause existed. Even if the Court is wrong is this respect, the Court's analysis at the very least demonstrates that the Prewitt Affidavit is not "so lacking in probable cause that the officer's belief in its existence was entirely unreasonable." *Mitten*, 592 F.3d at 771. Indeed, "in the ordinary case, a law enforcement officer cannot be expected to question the magistrate's probable cause determination." *United States v. Curry*, 538 F.3d 718, 730 (7th Cir. 2008) (citation and quotation marks omitted). There is nothing out of the ordinary in this case that would lead Special Agent Prewitt to question the Magistrate Judge's determination, especially given that he submitted a fifty-four page affidavit with detailed information obtained via an extensive investigation of the Robbins Organization.

Accordingly, the Court concludes that even if probable cause was lacking, the good-faith exception to the exclusionary rule applies. For this additional reason, the Court must deny Mr. Robbins' Motion to Suppress.

### C. Mr. Robbins is Not Entitled to a Hearing on His Motion

Mr. Robbins makes a one-sentence request for the Court to hold an evidentiary hearing "to provide him the opportunity to present evidence and additional argument in support of his Motion." [Dkt. 111 at 7.] The Court is not required to hold an evidentiary hearing on a motion to suppress "as a matter of course." *United States v. McGaughy*, 485 F.3d 965, 969 (7th Cir. 2007). A hearing is only required "when the allegations and moving papers are sufficiently definite, specific, non-conjectural and detailed enough to conclude that a substantial claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion." *Id.* (quoting *United States v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004)); *see United*

*States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011). To be entitled to a hearing, "the onus [is] on [the] defendant . . . to specifically allege[] a *definite disputed factual issue*, and to demonstrate its materiality." *McGaughy*, 485 F.3d at 969 (emphasis and third alteration in original) (citation and quotation marks omitted). Mr. Robbins falls well short of his burden to establish that he is entitled to an evidentiary hearing. He makes only a generalized request for a hearing, and certainly does not make "specific[] alleg[ations] [of] a *definite disputed factual issue*." *Id.* (emphasis in original). Accordingly, his request for a hearing on his motion is denied.

### III.
### CONCLUSION

For the reasons explained, the Court **DENIES** Mr. Robbins' Motion to Suppress. [Dkt. 110.]

04/07/2014

_____
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**